UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANNY M. KELLY,
     Plaintiff,

       v.                                 CIVIL ACTION NO. 15-14219-ADB

TOWN OF CHELMSFORD,
     Defendant.

REPORT AND RECOMMENDATION ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (#32).

KELLEY, U.S.M.J.

I. Introduction.

     Danny M. Kelly, pro se, filed a complaint against the Town of Chelmsford, asserting that

Chelmsford "intentionally, willingly, wantonly and culpably allows a religious Holiday display to

be on Town property at School Street and Main Street in blatant violation of the First Amendment,"

in violation of 42 U.S.C. § 1983. (#1 at 1, 5.)[1] He requests "declaratory, compensatory, emotional

---

[1] Mr. Kelly presently is charged in this district with violating 18 U.S.C. § 844(I), malicious destruction of property used in interstate commerce by means of fire, by "deploying incendiary devices on and around power transmission lines." *See United States v. Kelly*, 16-cr-10159-ADB, #14 (the Criminal Case). While this lawsuit concerns a religious display on the Town of Chelmford's property, the complaint includes a long statement about another dispute Mr. Kelly has with Chelmsford, having to do with the Town's taking a parcel of his land by eminent domain in 2001. (#1 at 2-4.) That dispute looms large in Mr. Kelly's criminal case, as Mr. Kelly asserted there that he was wrongfully criminally prosecuted by the government in order to silence him and keep him from suing Chelmsford about the loss of his land. 16-cr-10159-ADB, #117 at 8. Mr. Kelly has filed numerous civil lawsuits over many years, complaining about the taking of his land and other matters. He has sued corporations, small businesses, Chelmsford, and government officials, among others. *See* 16-cr-10159-ADB, #117 at 7, 10. It appears that all the many cases Mr. Kelly has filed have been dismissed, other than this pending case. *Id*. at 10.

In the Criminal Case, Mr. Kelly was found incompetent to stand trial under 18 U.S.C. § 4241 in March 2017 due to a mental health diagnosis that prevents him from understanding the nature

and punitive damages in an amount to be determined by the Court." *Id*. at 5. Chelmsford moved

for summary judgment. (#32.) Mr. Kelly opposed, and Chelmsford replied. (##35-37.)  Because

Mr. Kelly has offered no evidence that Chelmsford owned, knew about, or otherwise sanctioned

the display, this court recommends that the Town's motion for summary judgment be allowed.

II. <u>Facts</u>.

Discovery in this matter consisted only of written discovery. (#33 at 3.) No depositions

were taken and no documents produced other than a picture of the display attached to the complaint

by Mr. Kelly. *Id*. In determining whether summary judgment is proper, the court views the record

in the light most favorable to Mr. Kelly and draws all reasonable inferences in his favor. *Avery v.*

*Hughes*, 661 F.3d 690, 693 (1st Cir. 2011); *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006).

A "document filed pro se is to be liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94

(2007). The court recognizes that in this case, not only is Mr. Kelly acting pro se, he is also

incarcerated in connection with the civil commitment petition filed by the government under 18

U.S.C. § 4246, thus further impeding his ability to litigate this matter.[2] Still, at the summary

judgment stage, even a pro se, incarcerated plaintiff must produce "'specific facts sufficient to

deflect the swing of the summary judgment scythe.'" *Mancini v. City of Providence by & through*

*Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15,

---

of the proceedings against him and assisting in his defense. (16-cr-10159-ADB, ##117 at 20-25, report and recommendation; 124, Order of Burroughs, D.J., adopting report and recommendation.) The government then filed a petition under 18 U.S.C. § 4246, asking the court to hold a hearing to determine whether Mr. Kelly suffers from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another. 18-cv-11102-MPK, #1 (the Civil Commitment Case). In that matter, the parties are presently negotiating conditions of release. *Id*. at #29. Mr. Kelly is in custody awaiting resolution of the Civil Commitment Case at the Federal Medical Center Devens, in Ayer, Massachusetts.

[2] In spite of Mr. Kelly's well-documented mental health problems, the court previously found that he is capable of litigating this case and found that it was not necessary to appoint a guardian ad litem under Fed. R. Civ. P. 17( c). (#25.)

19 (1st Cir. 2003)). Here, the court will consider events "within the plaintiff's personal knowledge," attested to by Mr. Kelly, such as answers to interrogatories or requests for admission, or set out in his pleadings, as facts for purposes of summary judgment. *Noviello v. City of Boston*, 398 F.3d 76, 84-85 (1st Cir. 1998). That said, "'conclusory allegations, improbable inferences, acrimonious invective, or rank speculation' will not suffice." *Mancini*, 909 F.3d at 38 (quoting *Ahern*, 629 F.3d at 54). The facts upon which the court may rely at the summary judgment stage "typically [are] set forth in affidavits, depositions, and the like, [and] must have evidentiary value; as a rule, '[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment.'" *Noviello*, 398 F.3d at 84 (quoting *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998)); *United States v. Coloplast Corp.*, 327 F. Supp. 3d 300, 304 (D. Mass. 2018) ("Summary judgment cannot be resisted by pointing to evidence that would ultimately be inadmissible at trial.").

The facts set out below are undisputed except where noted. Mr. Kelly is a resident of Chelmsford. (#8 at 1.) A picture of the display is found at the end of his complaint; at the bottom of the picture, Mr. Kelly attests that it was taken on December 17, 2015, just a few days before the complaint was filed on December 22, 2015.[3] (#1 at 7.) The picture is blurry. *Id.* The display consists of three large free-standing letters, spelling out the word "JOY." *Id.* The "J" and "Y" are red, while the "O" is white. *Id.* There are white carvings on the "O" consisting of a star at the top of the letter, and inside the letter, three silhouettes. *Id.*

Looking at the picture, one cannot clearly see what the silhouettes depict. In a pleading, Mr. Kelly refers to the silhouettes as "a Nativity Scene Icon." (#36 at 1.) He further describes them

---

[3] In an answer to an interrogatory, Mr. Kelly stated that he took the picture. (#34-6 at 7.) The interrogatory answers are attested to by Mr. Kelly. *Id.* at 13.

as "[a] star over a manger holding a baby with people praying with hands clasped." *Id*. at 4. These descriptions of the silhouettes are facts within Mr. Kelly's personal knowledge, since one may infer that he has seen the display. In addition, the court notes that red and white are traditional Christmas colors, and the word "joy" is commonly used to celebrate the Christmas season, for example, it is frequently found on Christmas cards. Therefore, the court will accept for summary judgment purposes that in fact, the display references the birth of Jesus.

In the picture, the display is located within a few feet of a flag pole flying an American flag. (#1 at 7.) Directly behind the display is a small tombstone or, perhaps, an historical marker of some kind. *Id*. There are two buildings within a few feet of the display, one on either side of the display, which appear to be colonial-style houses. *Id*. Whether they are homes or businesses cannot be discerned from the picture. The plot of land on which the display stands is small, and could possibly be part of the yard of the house in the background of the picture; in fact, in the background one can see what appears to be a car in a driveway. *Id*.

In his answers to interrogatories, Mr. Kelly states that the JOY display stood "for at least the Christmas season of 2012, 2013 & 2015." (#34-6 at 1.)[4] He states that it "goes up around Thanksgiving" and "is taken down in early January." *Id*. at 5. In 2015, "it seemed to be taken down earlier." *Id*. He alleges that the display was located on the corner of School Street and Main Street

---

[4] Mr. Kelly was arrested in connection with the Criminal Case on April 4, 2016, and has been in custody since that time. *United States v. Kelly*, 16-cr-10159-ADB, #2.

in Chelmsford[5] on property owned by the Town.[6] (#1 at 7; #34-6 at 1.) Mr. Kelly states that he

would go by the intersection where the display was located "at least four times a day." (#34-6 at

11.)

Mr. Kelly has "no idea who owns the display." *Id*. at 1. Chelmsford asserts that it did not

learn of the display's existence until Mr. Kelly filed this action, which the court understands to

mean Chelmsford denies owning the display. (#34-4 at 2.) Chelmsford has no documents

concerning complaints about private displays on Town property during the years of 2013, 2014,

and 2015. (#34-3 at 1.) Chelmsford has no policies or police procedures regarding private displays

on town property. *Id*.

Mr. Kelly avers that his wife, May DeViney, made oral complaints to the town in 2012 and

2013 which "went nowhere," as the "Town's manager's office just told her they would notify the

Building Inspector. The display would just remain until the end of the Christmas season." (#34-6

at 7.) The court does not consider Mrs. DeViney's alleged complaints to be competent evidence

as they are inadmissible hearsay. *Noviello*, 398 F.3d at 84-85.

Mr. Kelly never made any written complaint to the Town prior to filing this lawsuit, nor

did he call anyone to complain about the display. (#34-6 at 7, 13.) Neither party possesses any

---

[5] Mr. Kelly asked Chelmsford to admit that the picture depicted the corner of School Street and Main Street, and Chelmsford responded that it was "without knowledge or information sufficient to admit or deny whether the document is a 'picture' of School Street and Main Street," but conceded that "it appears to be a photocopy of a photograph depicting the area referenced." (#34-4 at 1.) The court considers this somewhat disingenuous answer to be an admission that the picture depicts the corner of School Street and Main Street in Chelmsford.

[6] Mr. Kelly asked Chelmsford to admit that the display was on Town property. (#34-4 at 1.) Chelmsford responded that the display "may be on Town property in that particular photograph." *Id*. at 2. The court considers this an admission that the display in the picture was on Town property. The picture is detailed enough so that one could identify the precise location of the display. (#1 at 7.) Surely the Town knows whether the property depicted in the photograph is owned by the Town.

documentation relating to complaints made to the Town regarding the display. (##34-2 at 1; 34-3 at 1.)

### III. <u>Summary Judgment Standard</u>.

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1st Cir. 2005) (internal quotation and citation omitted). The party moving for summary judgment bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill*, 335 F.3d at 19; Fed. R. Civ. P. 56(c). An issue is "genuine" if the record allows a rational factfinder to resolve it in favor of either party. *Borges ex. rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010). A fact is "material" only "if its existence or nonexistence has the potential to change the outcome of the suit." *Id*. at 5. Once the moving party asserts the absence of genuine issues of material fact, the non-movant must demonstrate the existence of a factual dispute with requisite sufficiency to proceed to trial. *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006).

### IV. <u>The Law</u>.

In weighing whether a factual dispute is "material," the court must examine the substantive law of the case, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

#### A. <u>42 U.S.C. § 1983 Claim</u>.

Title 42 U.S.C. § 1983 is a procedural mechanism through which constitutional and statutory rights are enforced. *Albright v. Oliver*, 510 U.S. 266 (1994).

The legal framework pertaining to a section 1983 claim is well established. 'Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law.' *Redondo–Borges v. U.S. Dep't of HUD*, 421 F.3d 1, 7 (1st Cir. 2005) (quoting *Evans v. Avery*, 100 F.3d 1033, 1036 (1st Cir. 1996)). To make out a viable section 1983 claim, a plaintiff must show both that the conduct complained of transpired under color of state law and that a deprivation of federally secured rights ensued.

*Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011).

Here, Mr. Kelly claims that his First Amendment rights were violated by the Town of Chelmsford. (#1 at 1.)

B. <u>Establishment Clause Violation</u>.

The Establishment Clause of the First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion…." The Establishment Clause has come "to mean that government may not promote or affiliate itself with any religious doctrine or organization…." *County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 590 (1989), *abrogated on other grounds by Town of Greece v. Galloway*, 572 U.S. 565 (2014). The Establishment Clause applies to federal, state, and local governments. *See Everson v. Bd. of Ed. of Ewing Tp*., 330 U.S. 1, 15 (1947).

There are two primary cases from the Supreme Court pertaining to government-sponsored religious displays. In *Lynch v. Donnelly*, 465 U.S. 668, 670 (1984), the Court determined that a creche erected by the City of Pawtucket, Rhode Island, as part of a larger holiday display in a park, located in the heart of the city's shopping district and owned by a nonprofit organization, did not violate the Establishment Clause. The Court described the scene containing the creche as follows:

The Pawtucket display comprises many of the figures and decorations traditionally associated with Christmas, including, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads "SEASONS

> GREETINGS," and the crèche at issue here. All components of this display are
> owned by the City.
>
> The crèche, which has been included in the display for 40 or more years, consists
> of the traditional figures, including the Infant Jesus, Mary and Joseph, angels,
> shepherds, kings, and animals, all ranging in height from 5″ to 5′.

*Lynch*, 465 U.S. at 671.

The Court found that the creche, in the context of the entire display, did not violate the
Establishment Clause because "whatever benefit there [was] to one faith or religion or to all
religions, [was] indirect, remote and incidental." *Id*. at 683.

Five years later, in *Allegheny*, the Supreme Court considered two holiday displays. One, a
creche erected on the Grand Staircase of the Allegheny County Courthouse, which bore a sign
stating that it was donated by a Roman Catholic group, was held to violate the Establishment
Clause because:

> nothing in the context of the display detracts from the creche's religious message.
> The *Lynch* display composed a series of figures and objects, each group of which
> had its own focal point. Santa's house and his reindeer were objects of attention
> separate from the creche, and had their specific visual story to tell. Similarly,
> whatever a "talking" wishing well may be, it obviously was a center of attention
> separate from the creche. Here, in contrast, the creche stands alone: it is the single
> element of the display on the Grand Staircase.

*Allegheny*, 492 U.S. at 598.

The Court also considered that the creche "sits on the Grand Staircase, the main and most
beautiful part of the building that is the seat of county government." *Id*. at 599-600 (internal
quotations omitted). The Court concluded that under the circumstances:

> [n]o viewer could reasonably think that it occupies this location without the support
> and approval of the government. Thus, by permitting the 'display of the creche in
> this particular physical setting,' ... the county sends an unmistakable message that
> it supports and promotes the Christian praise to God that is the creche's religious
> message.

*Id*.

The second holiday display at issue in *Allegheny* was an 18-foot menorah, placed outside the City-County building (a building jointly owned by the City of Pittsburgh and Allegheny County, housing the city's principal offices) adjacent to a 45-foot decorated Christmas tree. *Id*. at 581-82. A sign placed at the foot of the tree stated that the city of Pittsburgh "salutes liberty. Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom." *Id*. at 582.

The Court found that there was no constitutional violation:

> The menorah, one must recognize, is a religious symbol ... [b]ut the menorah's message is not exclusively religious. The menorah is the primary visual symbol for a holiday that, like Christmas, has both religious and secular dimensions.... Accordingly, the relevant question for Establishment Clause purposes is whether the combined display of the tree, the sign, and the menorah has the effect of endorsing both Christian and Jewish faiths, or rather simply recognizes that both Christmas and Chanukah are part of the same winter-holiday season, which has attained a secular status in our society. Of the two interpretations of this particular display, the latter seems far more plausible and is also in line with *Lynch.*

> The Christmas tree, unlike the menorah, is not itself a religious symbol. Although Christmas trees once carried religious connotations, today they typify the secular celebration of Christmas.... The tree, moreover, is clearly the predominant element in the city's display. The 45–foot tree occupies the central position beneath the middle archway in front of the Grant Street entrance to the City–County Building; the 18–foot menorah is positioned to one side. Given this configuration, it is much more sensible to interpret the meaning of the menorah in light of the tree, rather than vice versa. In the shadow of the tree, the menorah is readily understood as simply a recognition that Christmas is not the only traditional way of observing the winter-holiday season. In these circumstances, then, the combination of the tree and the menorah communicates, not a simultaneous endorsement of both the Christian and Jewish faiths, but instead, a secular celebration of Christmas coupled with an acknowledgment of Chanukah as a contemporaneous alternative tradition.

*Id*. at 613–618.

## C. Municipal Liability.

The sole defendant in this case, Chelmsford, may be sued under § 1983. *Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 690 (1978). It is axiomatic that a municipality cannot be

held liable on a theory of respondeat superior, that is, because it employs a tortfeasor. *Id*. at 691.

To establish municipal liability under § 1983, a plaintiff must not only identify conduct attributable

to the municipality, but

> must prove that "action pursuant to official municipal policy" caused [his] injury.
> Official municipal policy includes the decisions of a government's lawmakers, the
> acts of its policymaking officials, and practices so persistent and widespread as to
> practically have the force of law. These are "action[s] for which the municipality is
> actually responsible."

*Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (some alteration in original) (internal citation

omitted); *see Haley v. City of Boston*, 657 F.3d 39, 51 (1st Cir. 2011).

Municipal liability clearly will attach if a violation occurs pursuant to an official policy or

a custom. *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 769 (1st Cir. 2010); *Welch v.

Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008). When an official policy exists that is unconstitutional

on its face, the inquiry is straightforward. *See*, *e.g.*, *Monell*, 436 U.S. 658 (finding liability for

enforcement of an unconstitutional city policy that required pregnant employees to take unpaid

leaves of absence before medically necessary). When a plaintiff points to no specific

unconstitutional policy, however, as is the case here, a claim of municipal liability must be

grounded in a custom as evidenced by widespread action or inaction by public officials. *See

Whitfield v. Melendez-Rivera*, 431 F.3d 1, 13 (1st Cir. 2005); *McElroy v. City of Lowell*, 741 F.

Supp. 2d 349, 353 (D. Mass. 2010) (citing *Fletcher v. Town of Clinton*, 196 F.3d 41, 55 (1st Cir.

1999)).

The First Circuit has explained the difference between official policy and unofficial

custom: "[u]nlike a 'policy,' which comes into existence because of the top-down affirmative

decision of a policymaker, a custom develops from the bottom-up." *Baron v. Suffolk County

Sheriff's Dept.*, 402 F.3d 225, 236 (1st Cir. 2005), *abrogated on other grounds by Jennings v.*

*Jones*, 587 F.3d 430 (1st Cir. 2009) (alteration in original) (internal citation omitted); *Hernandez v. Colon*, No. 3:16-CV-30089-KAR, 2018 WL 2422008, at *19 (D. Mass. May 25, 2018), *reconsideration denied*, No. 3:16-CV-30089-KAR, 2018 WL 3383414 (D. Mass. July 11, 2018). Such a custom "must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989); *Whitfield*, 431 F.3d at 13; *Yourga v. City of Northampton*, No. CV 16-30167-MGM, 2018 WL 5084840, at *4 (D. Mass. Oct. 18, 2018).

The Supreme Court has further described the causation requirement:  A plaintiff who brings a § 1983 action against a municipality bears the burden of demonstrating that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original) (internal citation omitted); *see also Haley*, 657 F.3d at 51; W*hitfield*, 431 F.3d at 13 (quoting *Bordanaro*, 871 F.2d at 1156) ("[T]he custom must have been the cause of and 'the moving force behind' the constitutional violation.").

There is no evidence in this case that Chelmsford had any official policy concerning religious holiday displays. Thus, the only possible theory of municipal liability here is that Chelmsford had a custom of allowing the JOY display to remain on Town property that was "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro,* 871 F.2d at 1156.

V. Discussion.

Viewing the record in the light most favorable to Mr. Kelly, the court accepts Mr. Kelly's assertions that in 2012, 2013 and 2015, the JOY display was on the Town's property from late November through December, that is, for about a month each year. (#34-6 at 1, 5.) As explained above, because Mr. Kelly presumably saw the display, the court also accepts Mr. Kelly's interpretation of the display as a reference to the birth of Jesus. (#36 at 1, 4.)

There is no direct evidence in this case, however, that the Town owned the display, actively permitted anyone to put it on Town property, or was aware of its existence. The Town denies ownership or knowledge of the display. (#34-4 at 2.) Mr. Kelly posits that the court can infer that the Town was aware of the display, and thus sanctioned it, for two reasons. First, he asserts that the display is located at a major intersection in Chelmsford, and thus Chelmsford officials must have known of it. (#36 at 1.) Second, he states that because the display was situated next to an American flag, town employees, who must have tended to the flag, must also have been aware of the display. *Id*. at 2-3.

These inferences do not rise to the level of competent evidence for summary judgment purposes to establish that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404. First, a close look at the picture that Mr. Kelly provided demonstrates that even though the display was on Town property, that fact may not have been obvious even to officials of the Town passing by the site. As mentioned earlier, the picture clearly shows that the plot of land on which the display sat is very small, is bordered on two sides by unidentified buildings that appear to be homes, or businesses situated in former homes. (#1-7.) This is not a situation where a holiday display is in a county courthouse on the Grand Staircase,

the "main" part of a building "that is the seat of county government," or under an arch leading to the entrance of a major municipal building, as in *Allegheny*, 492 U.S. at 581, 599-600, so that it was obvious that the display was sanctioned by the government. Notwithstanding the flag and small stone marker, one might easily think that the small plot of land, or at least, the part on which the display stood, was private property.

Further, there is no evidence that the American flag in the picture belongs to the Town or is maintained by Town employees. Although the court has found that the Town, in providing answers to discovery requested by Mr. Kelly, admitted that the display was on Town property, that does not mean that the flag necessarily was taken care of by Town employees, who then must have noted the presence of the JOY display, and then did not act to remove it. The Town cannot be found to have violated the Establishment Clause without evidence that the Town permitted the display to remain on Town property. *Bordanaro*, 871 F.2d at 1156. In the particular circumstances of this case, that vital proof is absent.

Mr. Kelly has failed to proffer sufficient evidence to raise a genuine issue of material fact on the issue of whether Chelmsford had a custom of permitting a religious display on Town property. His claim must fail, and the Town is entitled to the entry of judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## VI. Conclusion.

For the reasons stated, I RECOMMEND that the Motion of the Town of Chelmsford for Summary Judgment (#32) be GRANTED.

## VII. Review by the District Judge.

The parties are hereby advised that any party who objects to this recommendation must file specific written objections with the Clerk of this Court within 14 days of service of this Report and

Recommendation. The objections must specifically identify the portion of the recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Federal Rules Civil Procedure, shall preclude further appellate review. *See Keating v. Secretary of Health & Human Servs*., 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


                                                    /s/ M. Page Kelley
                                                    M. Page Kelley
January 22, 2019                                    United States Magistrate Judge